at number three which is 23-1761 Monica Rongere versus the City of Rockford, Illinois. Mr. Urani, is that correct? Yes, that's correct, Judge. Thank you very much. Thank you. Good morning again. Good morning. May it please the court. My name is Joe Urani and I, along with my partner John Kramer, are here today on behalf of the appellate Monica Rongere. We respectfully request to reserve five minutes for rebuttal which Mr. Kramer will do. We are respectfully asking this court to reverse the decision of the federal district court granting summary judgment on behalf of the City of Rockford. The main issues of this appeal that I would like to address in my time before you are all the genuine issues of material fact that exist that render the granting of summary judgment inappropriate on plaintiff's retaliation claim, on her Title VII sex discrimination claim, her EPA violation claim, and her hostile work environment claim. Mr. Urani, may I ask you please how many women and how many men had the role of senior manager at the City? You know, Your Honor, I don't have the exact number of the differentiation. I believe that Ms. Rongere was one of the only women. There was, the majority of them were men. Ms. Rongere, I believe there were two others, if I'm not mistaken, but I don't know for sure. Thank you. Why is there no data in your information about what senior manager men and women earned at the City? Well, I believe that information is there, Judge, and I think that that goes to the EPA claim. And I think, you know, the crux of the facts in this case are with respect to what Ms. Rongere experienced and what she went through every day. She knew she was working two different senior management jobs at all times from the beginning, and she knew that she was earning less by approximation because of all the extra work she was doing compared to what the male in the briefs and in the lower court's decision with respect to the exact dollar amount. I don't think there's any case law that requires an EPA plaintiff to know the exact dollar amount of what the comparators are making. She knew she was definitely earning less. And I think it also is part and parcel with respect to the claims of sex discrimination. It goes hand in hand because she was a woman. She was complaining about all the extra work she was doing from the beginning. Her original boss that hired her, Cary Partridge, acknowledged in the only one review that she had that he acknowledged that he appreciated that she had the dual roles, the diversity procurement officer and the contract compliance officer roles, even though she was only hired for the first one. He acknowledged that and he appreciated that, and he also pressed forward in that review that he foresaw her roles expanding further and that her job description was going to be redefined. So from the beginning, she had the anticipation that she knew there was going to be a bigger role than she was just initially hired for on paper, at least. So I think that it goes heart and heart with the fact that she complained about the fact that she was being had to work all these hours. She continuously complained about all of that. And then that was nothing was ever done about that with respect to when the new management came on board. Now, just tell me, is it your contention that anyone who worked for the city of Rockford and was a senior manager was a proper comparator to Ms. Ranger? Well, yes and no. I mean, for purposes of this litigation, she testified to what she observed. I think she worked most closely with Carl Franzen and Mike Atkinson. I don't think the law doesn't require that you have to have more than one comparator. And I think that based on her observations and her testimony in the case, it really just concentrates on those two gentlemen. There's really, I don't think that... What made them comparable to her in your view? In my view, they were all senior managers. I think that might be a point of dispute, which I think goes to the question of fact. They were all senior managers. They all had... Mike Atkinson and Ms. Ranger reported to Nick Myers directly. They all had to go to the same meetings. There's internal documents that were produced by the defense that show that there was a senior management meeting on one of the schedules. And then there's testimony, I think, that we go through in the briefs that show that the mayor at least acknowledged at one point the role of senior manager. And these groups of people all had oversight over their specific areas. They all had to go to the same meetings and report on the oversight of that. Yes, they were different because they, by definition, they were different because they each controlled a different area. But they all worked in the same office. They all controlled their own specific area. Ms. Rangeri had two areas as opposed to Mr. Carl, Mr. Franzen, and Mr. Atkinson. But the comparable part about that is that they were all on that same level of management. Let me tell you the problem that I have been struggling with. And that is, where is the alleged maltreatment that she experienced had to do with gender? In other words, you say she was treated this way because of her gender. But why should we conclude that it was because of her gender? Well, I think it goes back to the way she complained about that. She complained to the mayor in June of 2017. And she complained that she has all these other responsibilities and she's not being paid for that. And she did, in that complaint, bring up the fact that it was her gender. And then even more, even going a step before that, I mean, she complained about all the additional work that she had to do. And I guess, for lack of a better word, it was more of like domestic things that she was required to do. She was required to have food available at meetings. She was required to bring donuts. She was required to always be the one that goes grocery shopping for these events and clean up afterwards. The men didn't have to do that. She complained about that also to her boss, Nick Myers, on June 7th, June 5th, I'm sorry, of 2018. And then two days later, as she was leaving to go to a wedding, which she already had approved a vacation time for, she was called into Nick Myers' office and terminated for alleged performance reviews that didn't come until the letter was given to her. But there was no specifics about those performance issues. That didn't come until the depositions, in this case, where it was specified that the problems were these meetings that she allegedly ran nine months before her termination, where Mr. Meyer and the mayor were upset with the way she conducted those meetings. So I think it all kind of, this is a very fact-intensive case. It all blends together. But the fact that she complained about that, and she made it known that, hey, this has happened to me because I'm a woman. The men don't have to go out and decorate. Men don't have to do this. And by the way, you know, from the beginning, I had these dual responsibilities, and they just kind of went ignored. You never really acknowledged that. I'm still doing the work, and you've never sat me down and let me know that, hey, this is what we're going to do. We're going to increase your wages. We're going to make sure that you're paid. And all of that escalated until, you know, in our view, on June 5th, it all came to a head, and she complained to her direct boss. And then that was it. It was enough that they just didn't want to deal with it anymore. So they terminated her two days later. The nexus in time alone, I think, is a question of fact that renders this case, just on that issue alone, improper for summary judgment. A jury should decide whether or not that was proper. And I think part of the problem is that there's so many facts involved in this case. And the reason that it's so difficult, really, to argue it in an appeal situation is because all we are is arguing the facts. There's so much here that should have been answered that wasn't answered in either the appellate review, I mean, in the lower court's opinion, or even in writing these briefs. I mean, it's just replete with facts that we don't know the answer to. And I think, you know, we request that, you know, you reverse that and let the jury decide these issues. Thank you. Thanks. Morning, may it please the Court. Josh Vinson on behalf of the defendant's city of Rockford. I couldn't disagree more with Mr. Ureni's statement that the facts are complicated. This is a pretty simple and straightforward case. You know, the Equal Pay Act is very clear that if you're going to make a claim that you're not getting the same pay as a male comparator in this case, you've got to show that the jobs involve the same skill, effort, and responsibilities. And the facts on that are extremely well settled in this case and completely uncontroverted. You couldn't have three jobs that couldn't be more different. And the plaintiff was charged with the responsibility of drawing more minority work to the city, more minority work contractors, women-owned businesses, so that they could do more business with the city. And she was also charged with making sure that those contractors, that their wage submissions complied with the prevailing wage laws. Her two comparators, one, Mr. Hankinson, he's the land transactions officer. That gentleman is basically the city's real estate broker, real estate agent. He goes out and he buys property for the city, he sells property for the city, he does title work, he does real estate closings, has absolutely no comparison whatsoever to the job that the plaintiff had. And the same is true with Carl Franzen. Mr. Franzen was the economic and community development coordinator. You know, he's involved with enterprise zones, tax increment financing, bringing industry into the city, making sure subdivisions are built for people to live in, bringing business there for jobs. These are totally, completely different jobs with completely different responsibilities. And if you look at docket 77-5, page 30, where the plaintiff was asked point blank, do you contend that your job involved the same skill, effort, and responsibility of these two other gentlemen? She says, no, flat out. I mean, it's a flat-out admission. There absolutely can't be an equal pay, I claim, under the circumstances of this case. Putting aside the fact that she's paid the identical amount as Mr. Hankinson, so there was no disparity in pay, even though, I mean, their jobs are different, there's no disparity in pay. And with regard to Mr. Franzen, the jobs are just simply not comparable. The sex discrimination case failed in the district court for a very simple reason, not complicated at all. The reason was she couldn't identify a single male comparator, another male, who was fired for, who performed poorly on the job and was not fired. I mean, it's a classic sex discrimination case. Anytime you're going to make a claim like that, you're going to have to identify someone who, you know, performed, did the same thing wrong that you supposedly did wrong, but was treated better. She can't identify anybody on that. And the argument on this point is completely forfeited because she never addresses any of that in her brief. Doesn't even respond to the district court's basis for entering summary judgment on that particular claim. The... Can you address the suspicious timing? In other words, she complained of unequal treatment two days before she was terminated. Well, the single biggest problem with that argument, Judge Rovner, is the plaintiff admitted that she never knew how much these men made. So it was impossible for... Impossible, literally impossible for her to have told her boss on the day that she claims that she's underpaid compared to these other men that work in the office when she admits on the record, and that's docket 77-4, page 55 of the PDF, page 211 of the mini script. She admits right then and there, she never knew what anybody else made. So you can't complain about being underpaid relative to a male or another person if you have no idea what they make. And that's what she admitted. So again, these are not complicated facts. You know, the thrust of the argument here and the thrust of the brief, the entire theme of the brief is someone who is contending, I worked harder than everybody else and I should have been paid more. That's not a discrimination case. That's just not a discrimination case. It never has been. You know, it's about the closest you would ever find, I think, in the jurisprudence of this court on that sort of issue would be workload discrimination. She doesn't even try to articulate a workload discrimination case, and this court has previously held that workload discrimination is not an adverse employment action. Giving someone a heavier workload is not an adverse employment action. But here you put that aside. You know, you got to keep in mind, these are all FLSA-exempt salaried employees. So they're not punching a clock. Everybody's just expected to be there at a reasonable and predictable time in the office, and her contention is she's just working harder than everybody else. And you can't make a discrimination case out of something like that because there's no way to quantify it. It's a purely subjective assessment when someone says, I work harder than the next person, you know, and especially when their jobs aren't even the same. I mean, certainly, you know, I'm sure there's plenty of lawyers in my office who will say they work a lot harder than I do, okay? But, you know, that may be, you know, or maybe I work harder than they do because I'm not as smart, okay? I can't write a brief in two or three days. Some people can. Some people, for me, it's going to take weeks to write a brief. Do you think you really want all this on the record? At my age, Judge Rovner, I don't worry too much about that anymore. At least there's no transcript, right? It's just recorded. That's true. It's a good thing you guys don't allow transcripts of these hearings. Is there any evidence in the record that prior to June 2018, anyone ever advised her that she was not meeting expectations? Indirectly, yes, okay? I mean, I certainly will concede that there isn't, you know, a performance evaluation, which you might classically consider a write-up that says, you know, you're in trouble, but I will say this. If you look at dockets 77-13 to 77-23, it's a series of exhibits, and you'll see that there's email exchanges where her boss, Nick Meyer, is making it very clear to her that she's not performing properly. She's bringing these problems to him, saying she has grave concerns about things, without saying what her grave concerns are about, without identifying them. She comes to him with problems, and she offers no solutions, and he points this out to her explicitly in emails. It seems like everyone in this dynamic was very conflict-averse. Nobody wanted to just have the difficult discussion with regard to either performance or the claim that the plaintiff was making. That could be. I mean, she was aware there was a problem, all right? The evidence is also, again, not complicated, very clear. She, as the person in charge of minority and women business enterprises trying to bring those in the city, she was responsible for reaching out to that community, hosting meetings. The very first meeting that she hosted, she stood up, introduced herself, sat down, didn't run the meeting. The mayor had to step up and run the meeting himself. He was extremely upset about that. He complained to her boss, Nick Meyer, the legal director, about that. Nick spoke to her about it. That's un-controverted. It's un-controverted that she confided in Carrie Partridge, who had previously been the interim legal director, that she thought the mayor and Nick were unhappy with her performance for this very reason, because she wasn't getting these things done in terms of conducting these meetings, the reach-out or outreach to the minority and women business community. She said she was afraid that her job was on the line. She confided that. Completely un-controverted evidence about that. Going back to your point, Judge Rovner, is there a temporal proximity issue here in terms of the timing? Well, not really for multiple reasons. One, because as I said, she had no idea what anybody else made at the time she complained about it, so she couldn't have really had any reasonable belief that anyone else was making more than she was. Also, because there was knowledge on her part. If you look at those email exchanges that I mentioned, there was a contractor whose bid for some work had some technical non-compliance with it, and Nick and Mr. Meyer had to write back to her and say, hey, we're here to bring minority businesses into the community, not bar them. And she was sort of, for lack of a better term, she's a little officious. I think that's what, when you read her deposition in its entirety, both of That's how she comes across. Is there anything on the record about all this having to decorate and shop? Well, she says that, but again, you got to put it in the context of what her responsibilities were. Everybody told her, Kim Ryan, the finance director testified, Carrie Partridge, the former interim legal director testified, that in order to perform the outreach to the minority and women-owned business community, she was going to have to host these meetings. And nobody was going to come to the meetings if there wasn't any food. I mean, even Mr. Partridge said, don't even invite me to a meeting in the legal department. If there's no food, I'm not coming. And so that was all made very clear. So yes, she had to be in charge of that, just as sometimes I'm in charge of getting food for our CLE programs at my law firm. But that's the same thing. That's what she had to do. There's no contention that she ever asked to be reimbursed for that and was refused. There's no contention that anyone was actually ordering her to do that. I mean, that was just the expectations. If you're going to host a meeting, then you're going to provide food and beverage or at least make arrangements to make sure it happens. So again, that's getting kind of twisted in terms of how she's, I shouldn't say this, chief cook and bottle washer. Anybody who runs a meeting is going to have to do that. I wanted to touch on a couple of things also that came up here. Judge Rovner, you asked about other women employees at the city. There's some very senior people at the city of Rockford. Marcy Leach testified. She's the city engineer in charge of waterworks and things like that. Kim Ryan, another woman in charge of finance. She's the finance director. We go back to this issue about the common job responsibilities that supposedly existed. The plaintiff is basing that argument on the fact that they went to the same meetings, reported to the same person, and worked in the same office, but that's not the legal standard under the Equal Pay Act. It has to be the responsibilities of the job, not the fact that you may have a broad... And that's another thing. I mean, Kim Ryan, the HR person testified... Yeah, I think she's HR. She testified that senior manager is not really a job category or job title at the city. You might consider certain people at that level, but that's not the job description. The hostile work environment issue I wanted to talk about briefly. There, the plaintiff cites absolutely no analogous cases. Her entire argument is that people just ignored her sometimes, seemed to be condescending, didn't pay attention to her, may not have invited her to meetings. There's no case cited in the plaintiff's brief that's even comparable to that. The Patton case that we cited in ours is almost identical, where someone claimed that other folks in the office were standoffish, rude, or ignored them. The court found that that's not a severe and pervasive environment. Beyond that, those were the only notes I had that I wanted to touch on. Judge Reinhart declined to maintain supplemental jurisdiction over the state law claims. They'll survive. The plaintiff can pursue those. I think the judge gave very good reasons for why he didn't want to retain those particular claims. And I don't think there's any real contention that that's a start over. There would be absolutely no reason to redo the depositions in order for those claims to proceed in a state court. Unless the court has any specific questions? Nope. Hearing none, we thank you very much. And we're going to have Mr. Vincent come up. Mr. Kramer. Oh, I'm sorry. Thank you, Mr. Kramer. Good morning, Your Honors. Good morning. May it please the court. There are some points that I do want to address that were raised by counsel in response to Mr. Urani's statements. First off, it is important to note the timing. The timeline shows that this alleged event that she was written up for, was the performance issue, was nine months before, in October of 2017. There are no, there's nothing in the record that shows that that was brought to her attention, that she was written up for it, or that her job was on the line. I want you to, I want the court to look at the emails. There's nothing in those emails that counsel raised that said, listen, you're going to be written up for this, or you're going to be suspended for this, or let alone that you're going to be terminated. The only time that she was told she was going to be terminated was because two days before, she goes in and says, I'm being treated differently. And oh, by the way, I reported this to the mayor back in 2017, in June of 17. The other thing I want to point out, and I do want to point to Mr. Partridge, the only, the only review that was submitted about my client's job performance was a glowing review in May of 2017. Between May of 2017 and June, when she is terminated, there isn't one incident of Mr. Meyer or the mayor coming in and saying, listen, you're not doing your job very well. In fact, we were so upset about what you did nine months ago, we've now decided that we're going to terminate you for it. This goes to this conflict adverse environment where we have imperfect communication, perhaps going back and forth. Is that to be visited on both parties or just the city? Well, just the city judge, because at the end of the day, they're the ones that hold all the cards, right? They're the ones that get to determine if they're, they have, well, they have a progressive discipline policy. Your honor, they didn't, they completely ignored it. They went from zero to 90 in terminating her in two days. And what happened between those two days? The only event that happened in those two days was that she complained because Mr. Hackinson and Mr. Franzen, they weren't, they weren't the only difference in the senior manager duties. Listen, the EPA does not require an identical set of job duties and responsibilities. If that was the standard, no female would be able to bring any claim before the district court or this court because there's never going to be that case. In fact, the case that we cite to in the fourth circuit, the McCullough versus Allegheny County case addresses this specific issue because there were added responsibilities, but those added responsibilities was because she had to decorate. She had to go buy the donuts and go to the grocery store. She had to do her own typing. She had to go before the court or before the meetings and she had to do all the arrangements. Mr. There's nothing on the record that Mr. Hackinson or Mr. Franzen were called upon to do that. There's nothing that are in any emails that council cites to that addresses that point. The other thing is, is that how in the world is an employee supposed to know the exact dollar amount in confidential employment records of what her male counterparts phrase. She's basing her information on her observations, her interactions with the people in the department. They're the only comparables. So if we don't have a, and I read counsel's brief and you are good with three by the way, when you, when you write your brief, it makes it claim, it makes it seem like we have to have identical set of facts. You're never going to have that. We have senior managers. They attend senior manager meetings. They oversee their departments. Those are going to be the only comparables to who she has. And Oh, by the way, when you do a comparable fact analysis, it's all over in the case law, including the seventh circuit, that it's a very fact intensive exercise and that it's rarely should be decided on a summary judgment motion. And that when we do show, and we did show that she was not making as much money as one of her counterparts and that there was only one that she was, but interestingly enough, gentlemen and your honor, that what happened was after she was fired, they separated her job into two different jobs. And that was also referenced over a year before by Carrie Partridge in his embraced the expansion of her role into overall contract compliance monitoring and envision the need to redefine her job duties in the future. She's going to the mayor in 2017. She's going to Mr. Meyer and the mayor in 2018 saying, listen, I've already brought this up to you. I'm having all these other job duties, including the decorating, including go the And the other thing is, is that when you look at the testimony, there's a lot of, I don't know, and I don't remember from the key people of the defense, including the supervisor, including the mayor. And Oh, by the way, when they're asked questions about the salaries, they didn't even know what the salaries were. So if the mayor and the supervisor had trouble with that information and you had to go to the HR person for that information, how in the world do put that onto a plaintiff who's saying, listen, I work with these people in the same building in the same area. I don't see them doing any of this stuff. I'm having to do it. And Oh, by the way, I have these extra contract duties that my supervisor at the time says, we're going to have to look to expand that because you, your job duties have been expanded past what was set forth on your hiring that I'm going to have to ask you to pretty much wrap up. Okay. Your honor. I just think like my colleague, Joe Urani had mentioned, there are too many questions of fact, especially a counselor, your honor. You had to ask questions. What's your strongest argument on previous arguments here today? My strongest argument is going to be on the retaliation and on the discrimination. I think it's also very strong, maybe not as strong as on the retaliation and the discrimination, but also on the EPA, but on the retaliation and on the discrimination, they, they don't have any facts to controvert what our plaintiff is saying happened to her. And neither does the documents look at the emails, look at the review, look at the termination letter, the termination letter itself didn't even say or reference the October, 2017 meeting that they had this big problem about. I thank you for your time. Thank you. Yes. And we thank Mr. Urani, Mr. Kramer, and Mr. Vincent for their time. And the case will be taken under advice.